In the Supreme Court of Georgia

Decided:   November 3, 2014

S14A0748.  MERRITT v. THE STATE.

HINES, Presiding Justice.

Anthony C. Merritt appeals from his convictions and sentences for malice murder, possession of a firearm by a convicted felon, and possession of a firearm during the commission of the crime of malice murder, in connection with the death of Jerron Jackson.  For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Merritt and Jackson shared a home in a mobile home park.  On the afternoon of July 31, 2011, Timms, who was a neighbor of Merritt and Jackson, heard gunshots,

[1]The crimes were committed on July 31, 2011.  On October 5, 2011, a Stephens County grand jury indicted Merritt for malice murder, felony murder while in the commission of aggravated assault, felony murder while in the commission of possession of a firearm by a convicted felon, aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of the crime of malice murder.  Merritt was tried before a jury April 16-19, 2012, and found guilty on all counts.  On April 25, 2012, he was sentenced as a recidivist to life in prison without the possibility of parole for the crime of malice murder, and two consecutive terms of five years in prison for possession of a firearm by a convicted felon and possession of a firearm during the commission of the crime of malice murder; the remaining charges either merged with a crime for which a sentence was entered or were vacated by operation of law.  See *Malcolm v. State*, 263 Ga. 369, 371-374 (4) (5) (434 SE2d 479) (1993).  Merritt moved for a new trial on May 11, 2012, and amended the motion on December 31, 2012.  On November 7, 2013, the motion, as amended, was denied.  Merritt filed a notice of appeal on December 6, 2013, and the appeal was docketed in this Court for the April 2014 term and submitted for decision on the briefs.

although she did not see who fired them; Jackson approached Timms and asked her to call 911. Soon thereafter, Merritt approached her and said not to call the police as he was a convicted felon. As the two men walked back to their home, they argued; Jackson told Merritt to find another place to stay and Merritt said that if Jackson had a "beef" with him, they could settle it "right now." A handgun fell from Merritt's pants, and he retrieved it from the ground. Timms called 911, but the responding sheriff's deputy was unable to get a response at Merritt's home.

Later that afternoon, Timms heard two gunshots from inside Merritt's home. She did not see Jackson again, but saw Merritt leave the home and go into a nearby wooded area; on multiple occasions, Merritt paced outside the home, apparently under the influence of drugs or alcohol. At some point, Merritt telephoned his former fiancee and said "something about somebody got shot or something like that." Merritt also telephoned his grandmother and said "something had happened and somebody had been shot, something about his roommate."

After hearing the gunshots from inside Merritt's home, Timms stopped a passing sheriff's deputy and identified Merritt as the person from whose pants

2

the handgun had fallen, and the deputy left the area. Merritt went to Timms's home and asked what Timms had told the deputy; she responded "nothing," and Merritt said he "could take [Timms] out, too." Timms called 911 and responding sheriff's deputies established a perimeter around Merritt's home, rather than immediately attempting to enter it. Before the deputies arrived, a man came to Timms's home, asked which mobile home was Merritt's, and said that he had received a telephone call to the effect that Merritt had shot his roommate; the man went to Merritt's mobile home, but did not stay long.[2]

After sheriff's deputies had been outside Merritt's home for two hours, the Sheriff of Stephens County was informed that the Georgia State Patrol SWAT team would not assist without a warrant being secured. Thereafter, deputies near the mobile home heard sounds from inside that appeared to be a person moaning, and the decision was made to enter the mobile home without a warrant. Inside, deputies found Jackson's body lying face up on the bedroom floor and Merritt lying face down on the bed, crying. A deputy handcuffed

---

[2] A defense witness testified that: Merritt's grandmother asked him to go check on Merritt as she understood that Merritt had shot his roommate; the witness went directly to Merritt's home by the directions he had been given; Merritt answered the door; from the door, the witness could see a dead body in the front room; it was difficult to communicate with Merritt, who appeared to be in a state of shock; and the witness left the home and telephoned Merritt's grandmother in an attempt to get further assistance for Merritt.

Merritt, who spoke toward Jackson's body, saying "get up off the floor and quit playing." Law enforcement investigators collected evidence from inside the mobile home that included unfired bullets, cartridge cases, and spent projectiles; a leafy green substance that appeared to be marijuana was found inmultiple places inside the home. Merritt smelled of alcohol and a later test of his blood showed the presence of marijuana. Jackson was lifeless and had been fatally shot once in the back by a handgun found in the woods outside the mobile home; the fatal projectile matched other projectiles recovered from inside the home. The moaning noise that deputies had heard was determined to have emanated from a refrigerator inside the home.

Merritt was interviewed by an agent of the Georgia Bureau of Investigation and, at first, said that he had gone to sleep, been awakened when deputies were standing over his bed, and that Jackson was alive and speaking to the deputies when Merritt was taken from the home. He later told the agent that he and Jackson sold marijuana; that "Carolina men" entered the home and robbed them in a "drug deal [that] went bad," and killed Jackson.

1. The evidence authorized the jury to find Merritt guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*,

4

443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Merritt contends that his trial counsel failed to provide effective representation in two respects. In order to prevail on these claims, he must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, he must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783. "'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

5

(a) Merritt contends that counsel should have pursued a motion to suppress the evidence taken from the mobile home as it was secured without a search warrant and no exigent circumstances existed such as to justify the entry without one.  However,

> "'[w]hen trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion.'" *Biggs v. State*, 281 Ga. 627, 631–632 (642 SE2d 74) (2007) (citation omitted).

*Williams v. State*, 290 Ga. 533, 535 (2) (a) (722 SE2d 847) (2012).  And, Merritt fails to meet this standard.

Trial counsel testified that he did not pursue a motion to suppress the evidence because he did not believe such a motion would have been successful, as the court would likely find that exigent circumstances existed to justify the warrantless entry into the home.  And, the evidence was such that this was certainly a reasonable strategic decision.  Law enforcement officers at the crime scene testified that, after being at the scene for some time, they heard sounds inside the home that appeared to be "moaning or gasping," and that the decision was then made to enter the home as there may have been a person inside needing immediate medical attention.  Such an exigency justifies a warrantless entry.

6

See *Brigham City v. Stuart*, 547 U.S. 398, 403 (II) (126 SCt 1943, 164 LE2d 650) (2006); *Johnson v. State*, 272 Ga. 468, 470 (2) (532 SE2d 377) (2000); *Lord v. State*, 297 Ga. App. 88, 91-92 (1) (a) (676 SE2d 404) (2009); *Love v. State*, 290 Ga. App. 486, 489 (659 SE2d 835) (2008). Merritt asserts that the testimony of the Sheriff and his deputies regarding the exigency should not be credited. However, the testimony at the motion for new trial hearing authorized the trial court's conclusion that, although the deputies had been on the scene for some time, they did not hear the moaning sound until much later, just before their entry, and did not have prior cause to believe that a living victim might be inside the home until the sounds arose.[3] See *Stringer v. State*, 285 Ga. 842, 843(2) (684 SE2d 590) (2009) ("On reviewing a trial court's ruling on a motion to suppress, evidence is construed most favorably to uphold the findings and judgment and the trial court's findings on disputed facts and credibility must be accepted unless clearly erroneous." (Citation and punctuation omitted.)) Although Merritt contends that there was sufficient time for the sheriff's deputies to secure a search warrant after they arrived at the crime scene, but

---

[3] Merritt's grandmother had previously telephoned 911 in a neighboring county to report a "murder" at Merritt's home, and this information was communicated to the Stephens County Sheriff's office.

before the warrantless entry, the exigency justifying such an entry "may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action." *Cardwell v. Lewis*, 417 U.S. 583, 595–596 (III) (94 SCt 2464, 41 LE2d 325) (1974). See also *Hall v. State*, 176 Ga. App. 428, 431 (2) (336 SE2d 291) (1985). Accordingly, even if counsel had moved to suppress the evidence gained by the warrantless entry into Merritt's home, there is no reasonable probability that the motion would have been granted and that the result of Merritt's trial would have been different. *Smith*, supra.

(b) Merritt also asserts that trial counsel was ineffective in failing to request jury charges on the lesser included offenses of voluntary and involuntary manslaughter. See OCGA §§ 16-5-2 and 16-5-3. However, counsel testified that Merritt was adamant that Jackson was killed by others in a "drug deal gone wrong" and that he had done nothing wrong; in fact, Merritt would not allow counsel even to discuss manslaughter with the District Attorney. "[D]efense counsel is entitled to base the defense on the veracity of the client's assertions." *Williams v. State*, 292 Ga. 844, 853 (3) (f) (742 SE2d 445) (2013) (Punctuation omitted.) And, counsel pursued the defense based upon these contentions by

Merritt, which were placed before the jury by introduction of his statement to a law enforcement investigator. The instructions that Merritt now claims should have been requested were inconsistent with the defense based upon Merritt's factual assertions, and "'it was reasonable for counsel not to request the charges in question.' [Cit.]" Id.

Judgments affirmed. All the Justices concur.