303 Ga. 127
FINAL COPY

S17A1884.  WINTERS v. THE STATE.

GRANT, Justice.

Appellant Tacomsi Winters was tried and found guilty of felony murder and related offenses in connection with the shooting death of Dionte Bradley.[1] On appeal, Winters contends that she received ineffective assistance of trial counsel and that the trial court committed plain error in instructing the jury. We disagree and affirm.

---

[1] Bradley was killed on December 22, 2011.  On March 20, 2012, a Fulton County grand jury indicted Winters for malice murder, felony murder predicated on aggravated assault with a deadly weapon, aggravated assault with a deadly weapon, and possession of a firearm during the commission of a felony.  After a trial held December 5 through 10, 2012, the jury found Winters not guilty of malice murder but guilty of the remaining charges. The trial court sentenced Winters to life imprisonment for felony murder and five years' imprisonment for possession of a firearm during the commission of a felony.  The aggravated assault count merged with the felony murder conviction for sentencing purposes.  See *McNeely v. State*, 296 Ga. 422, 426 (768 SE2d 751) (2015).  Winters filed a motion for new trial on January 3, 2013, which was amended on August 10, 2015, and September 28, 2015.  The trial court denied the motion for new trial on March 15, 2016. A consent order allowing an out-of-time appeal was entered on May 2, 2016, and Winters filed a notice of appeal the same day.  This case was assigned to the August 2017 term of this Court and submitted for a decision on the briefs.

## I.

Viewed in the light most favorable to the jury's verdicts, the evidence admitted at trial showed the following. Winters was romantically involved with Bradley, but the two had a tumultuous relationship and argued frequently. On one occasion, for example, Winters tried to run Bradley and some of his friends off the road as they were driving from one club to another. Later that night, she punched Bradley and hit him in the face with the heel of her shoe, requiring him to get stitches.

Although Bradley paid the rent for the house where Winters lived, he did not live there with her; instead, he lived with his fiancée and their daughter. It is fair to say that Winters was unsatisfied with that arrangement. One night in May of 2011, Bradley was at home asleep with his fiancée, Wyterius Brewster, when the power went out—but only in their home. When Brewster looked out the window, she saw Winters running across their yard. Soon afterward, Winters called Brewster and informed her that she and Bradley had been having unprotected sex and had "started to get serious," but she was also upset that Bradley refused to leave his family and "didn't want to mess with [Winters] no more." During that call, Winters also disclosed that she knew Brewster's full name, where Brewster lived, and that Brewster had a lot of

children.  A few months later, Brewster was driving to a club to give Bradley his car keys and Winters, who was driving in the opposite direction, swerved toward Brewster as though she was going to hit her.  When Brewster was leaving the club, she once again saw Winters driving toward her; Brewster pulled over and called Bradley, who came out and escorted her home.

Less than a month before Bradley's death, witnesses saw Winters become "furious" and argue heatedly with Bradley because he was talking to another woman at a club.  According to an acquaintance who overheard his conversations, Bradley's demeanor during phone calls with Winters in the days before his death became increasingly agitated, "hateful," and "angry."  The day before his death, Bradley spent the afternoon and early evening with two women that Winters knew.  It is not clear whether the intentions of any party were romantic.  Bradley seemed worried about Winters though, and he told his companions that he was "fed up" with her.  The women tweeted about their activities with Bradley that day; Winters followed one of the women on Twitter and admitted to police that she spent time on Twitter during the afternoon and evening before the shooting.

Winters was, in short, incredibly agitated regarding Bradley's interactions with other women.  Witnesses testified that Bradley received

multiple phone calls from Winters on the night of his death, and one overheard Bradley arguing with Winters on the phone at about 3:00 in the morning. Phone records were obtained for two of the six cell phones recovered from Winters's residence, and showed seven calls and a text message from Winters's cell phone to Bradley's cell phone between 10:00 p.m. that night and 2:04 a.m. on the day of Bradley's death. Bradley left his recording studio alone sometime after 3:30 a.m. He told friends he was going to "the house," and they thought he was going home.

Apparently the friends were incorrect. At approximately 3:55 a.m. on December 22, 2011, East Point police officers responding to a 911 call from Winters found Bradley dead in Winters's home. He had been shot in the chest. His car was parked in the driveway, and the engine was still warm when police arrived.

Winters was taken to the East Point police station and interviewed by police in three separate sessions. Videos of all three interviews were played for the jury at trial. Initially, Winters told police that a noise had awakened her and that she had turned on the bedroom light to find Bradley standing in front of her. He gave her a blank look and said, "Baby, it's me," and then collapsed. After he fell, Winters said, she saw that his shirt was wet with blood and called

911. Winters claimed to the officers that Bradley had not been shot inside the house, but must have been injured before he got there. Winters also said that she did not know how Bradley had gotten into her house. Although Bradley at one point had a key to the house, Winters did not think he still did because instead of using his key, Bradley always called before he came over so that she could open the door for him. Winters steadfastly denied arguing with Bradley that night and said that they were not having any problems.

During the course of the interviews, one of the police detectives told Winters that they knew Bradley had been killed in her house because his wound would have killed him within seconds; he could not have driven or even walked after being shot. Winters eventually admitted that she had shot Bradley in her bedroom, but argued that she had heard a noise and shot him in the dark, believing that he was an intruder. She did not realize that it was Bradley, she said, until she turned on the light. Winters also admitted, however, that before calling 911 she had gone to her back yard and thrown the gun into some bushes behind her house. Police later recovered the gun in the same area Winters described.

Winters does not contend that the evidence was insufficient to support her convictions. Nevertheless, as is our practice in murder appeals, we have

reviewed the record and conclude that the evidence presented at trial was sufficient to enable a rational trier of fact to find Winters guilty beyond a reasonable doubt of the crimes of which she was convicted. See *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

II.

Winters argues that her trial counsel was ineffective for failing to pursue a motion to suppress certain evidence introduced at trial. To succeed on an ineffective assistance claim, Winters must show both that her lawyer's performance was deficient, and that she was prejudiced by her lawyer's errors. *Strickland v. Washington*, 466 U.S. 668, 687-696 (104 SCt 2052, 80 LE2d 674) (1984); *Merritt v. State*, 296 Ga. 98, 100-101 (765 SE2d 316) (2014). To meet the first prong of the *Strickland* test, Winters must overcome the "strong presumption" that trial counsel's performance was adequate and that his decisions were "made in the exercise of reasonable professional judgment." *Marshall v. State*, 297 Ga. 445, 448 (774 SE2d 675) (2015) (citation omitted); see *Strickland*, 466 U.S. at 687-688. This burden is "extremely difficult" to meet where, as here, trial counsel did not testify at the motion for new trial hearing. *Wilson v. State*, 277 Ga. 195, 199 (586 SE2d 669) (2003).

To demonstrate prejudice for purposes of the second prong, Winters "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If either the deficient performance or the prejudice prong of the *Strickland* test is not met, this Court need not examine the other prong. See *Hendrix v. State*, 298 Ga. 60, 61-62 (779 SE2d 322) (2015).

A. We first address Winters's claim that her counsel was ineffective for failing to pursue a pretrial motion to suppress her three videotaped custodial statements to police. Contrary to Winters's assertion, it appears that her trial attorney did pursue his motion to suppress her statements and obtained a ruling from the trial court. Although the hearing transcript is not in the record before us and trial counsel did not testify at the motion for new trial hearing, the court's ruling was discussed on the record in a pretrial colloquy between counsel and the court. This record reveals that the court had reviewed all three videotaped statements and determined that Winters had unequivocally invoked her right to remain silent approximately halfway through the third interview. As a result, the trial court ruled that the first two interviews and the first half

of the third interview were admissible, but that the second half of the third interview, in which Winters confessed to shooting Bradley but claimed that she could not see him in the dark and thought he was an intruder, would be suppressed. But Winters's counsel subsequently announced that he and Winters had chosen to let the State introduce the suppressed testimony: "After discussing the matter and thinking through it, talking to my client about it, we have elected to let the State, if they so choose, to introduce the remaining portions that the court had suppressed of the video." The court then asked, "And that is your judgment that it's appropriate; is that right?" Counsel responded, "That is my judgment that it's appropriate." Under the circumstances of this case, we cannot agree that this strategic judgment constituted deficient performance.

Decisions made as a matter of trial strategy and tactics do not amount to ineffective assistance of counsel unless "they were so patently unreasonable that no competent attorney would have followed such a course." *Clark v. State*, 300 Ga. 899, 901 (799 SE2d 200) (2017) (citation omitted). Here, Winters's defense was that Bradley arrived and entered her bedroom unannounced, and that she shot him in the belief that he was an intruder. This is the same version of events that Winters gave in the last part of her third statement to police. By

consenting to the introduction of this previously-suppressed portion of her statement, Winters's counsel was able to present her defense to the jury, in Winters's own words, without subjecting her to cross-examination by the State. Given that, we cannot say that the decision to allow the State to play Winters's self-serving statement fell "outside the wide range of professional conduct to the point that the adversarial process at trial failed [Winters]." *Anderson v. State*, 285 Ga. 496, 499 (678 SE2d 84) (2009); see *State v. Abernathy*, 289 Ga. 603, 608-609 (715 SE2d 48) (2011) (strategic decision to rely on defendant's self-serving custodial statements introduced by the State rather than call the defendant to testify was reasonable). And because counsel actually pursued and lost the remainder of his suppression motion, Winters's claim that he abandoned it does not survive. Winters's claim of ineffective assistance on this ground therefore fails.

B. Winters also argues that her trial counsel was ineffective for failing to pursue a motion to suppress documents seized from her house pursuant to a search warrant. As noted above, the record indicates that a hearing on the motion to suppress was held, but the hearing transcript was not made part of the record on appeal. Neither, unfortunately, is there any indication in the record of whether or how the court ruled on the motion with respect to items

seized pursuant to the search warrant. This state of the record makes it impossible to determine whether counsel abandoned the motion to suppress the results of the search warrant as Winters claims or whether, as with the motion to suppress Winters's statements to police, counsel pursued the motion and the trial court simply denied it, at least in part. See *Harris v. Upton*, 292 Ga. 491, 494 (739 SE2d 300) (2013) ("While the issue of ineffectiveness of counsel may sometimes be determined without the testimony of trial counsel, it generally cannot be done when the basis of the claim involves matters outside the record.").

Even pretermitting the question of deficient performance, however, Winters's ineffective assistance claim fails because she is unable to make the required showing of prejudice. Winters argues that two specific documents, obtained pursuant to the search warrant and admitted at trial without objection, irreparably harmed her defense. The first is a handwritten document titled, "Goals for Remaining Year 2011," which lists various goals such as "Get a job," "Eat healthier," "Stop smoking cigarettes," and "Find new positive friends," and concludes with a prayer. The list also includes "Find new male friend possibly boyfriend," and "Keep my feelings in control about [Bradley]." The second document is a handwritten list of "pros" and "cons" about Bradley.

Although there were some items on the "cons" list indicating that Bradley was disrespectful or even abusive toward Winters, there were also several items on the "pros" list showing the benefits of the relationship from Winters's perspective, including love, money, status, "possible bright future," and a new house and car. Defense counsel referred to some of these items in closing, citing them as reasons Winters would not have deliberately killed Bradley.

In short, the documents contained positive indicators as well as negative ones. Given that none of the witnesses at trial had anything positive to say about Winters or her relationship with Bradley, the documents may very well have been more beneficial than they were harmful to Winters's defense. In any event, having reviewed the trial record and evaluated the weight of the evidence against Winters, including the extensive testimony regarding Winters's deteriorating and sometimes violent relationship with Bradley, Winters's initial lie to police, and her attempt to dispose of the gun she used to shoot Bradley, we conclude that there is no reasonable probability that the outcome of her trial would have been different even if her trial counsel had succeeded in excluding the two lists. Because Winters has not shown that any deficiency in her attorney's failure to have the documents excluded prejudiced

her, her claim of ineffective assistance on this ground also fails.  See

*Hernandez v. State*, 299 Ga. 796, 801 (792 SE2d 373) (2016).

## III.

Winters also argues that the trial court committed plain error in instructing the jury on the defense of mistake of fact.  Specifically, Winters contends that the court instructed the jury on mistake of fact, but failed to inform them that mistake of fact was an affirmative defense that, once raised, must be disproved by the State beyond a reasonable doubt.  Winters does not identify any other errors or omissions in the jury charge.[2]

Under OCGA § 17-8-58, we review a jury instruction to which no objection was made at trial only for plain error.  To meet the standard for plain error, Winters must show an obvious legal error in the trial court's instructions that affected her substantial rights, and which was not affirmatively waived. See OCGA § 17-8-58 (b); *State v. Kelly*, 290 Ga. 29, 33 (718 SE2d 232) (2011). In other words, "the proper inquiry is whether the instruction was erroneous, whether it was obviously so, and whether it likely affected the outcome of the

---

[2] A portion of the trial transcript containing the jury instructions at issue was not transmitted to this Court with the record from the trial court.  Nevertheless, because the State has not contested Winters's description of the instructions at issue (either at the motion for new trial hearing or in its briefing on appeal), we assume for purposes of this opinion that the trial court gave the pertinent instructions as Winters describes.

proceedings." *Kelly*, 290 Ga. at 33 (citation and punctuation omitted). If these first three prongs of the plain-error test are met, we may exercise our discretion to reverse "'if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.'" Id. (quoting *Puckett v. United States*, 556 U.S. 129, 135 (129 SCt 1423, 173 LE2d 266) (2009)).

Here, the mistake of fact that Winters argued to the jury was not separate from her defense of habitation argument; the asserted mistake was her belief that Bradley actually was an unknown intruder, and that she was thus justified in shooting him in defense of her home. Those are the same defense in this case. See OCGA § 16-3-23 (use of force justified to defend against unlawful entry into a habitation under specified circumstances). As we have said before, mistake of fact is not separate from a self-defense argument where the asserted mistake concerned whether the victim was armed and the defendant's use of force was thus justified. *Daniel v. State*, 285 Ga. 406, 411 (677 SE2d 120) (2009). Under the circumstances, then, the trial court was not required to give an instruction on mistake of fact at all, so it cannot be that the failure to clearly inform the jury that mistake of fact is an affirmative defense amounted to obvious error.

Regardless, Winters's claim on this issue also fails because she has not shown that the outcome of her trial would have been different absent the alleged error. See *Shaw v. State*, 292 Ga. 871, 873 (742 SE2d 707) (2013) (Plain error analysis "requires the appellant to make an affirmative showing that the error probably did affect the outcome below."). As Winters acknowledges, the trial court fully instructed the jury on defense of habitation, informed the jury that defense of habitation is an affirmative defense, and instructed the jury that the State bore the burden of disproving affirmative defenses beyond a reasonable doubt. Given that the asserted mistake of fact was intertwined with Winters's defense-of-habitation claim, the jury was properly instructed as to the State's burden of proof on her actual defense. As always, we presume that the jury followed the trial court's instructions in arriving at its verdict. See, e.g., *Sampson v. State*, 282 Ga. 82, 84 (646 SE2d 60) (2007) ("Qualified jurors are presumed to follow the instructions of the trial court."). Thus, there is no likelihood that the jury's verdict would have been different had the court instructed them that mistake of fact, like defense of habitation, is an affirmative defense.

Judgment affirmed. All the Justices concur.

Decided February 19, 2018.

Murder. Fulton Superior Court. Before Judge Russell.

Kenneth D. Kondritzer, for appellant.

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Joshua D. Morrison, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General, for appellee.