308 Ga. 825
FINAL COPY

S20A0171.  WHITEHEAD v. THE STATE.

ELLINGTON, Justice.

A Chatham County jury found Javis Whitehead guilty of murder and other crimes in connection with the shooting death of Dominique Larry.[1] Whitehead contends that the evidence was insufficient to rebut his claim of self-defense and to support his conviction for murder beyond a reasonable doubt. He also claims that the trial court erred in denying his motion to suppress his

---

[1] A Chatham County grand jury indicted Whitehead on August 10, 2016, for malice murder, two counts of felony murder, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. Whitehead was tried in November 2018, and the jury found him guilty on all counts. The court sentenced Whitehead to life imprisonment for malice murder, five years' imprisonment for possession of a firearm during the commission of a felony (consecutive to his sentence for murder), and five years' imprisonment for possession of a firearm by a convicted felon (consecutive to his sentence for possession of a firearm during the commission of a felony). The felony murder counts were vacated by operation of law, and Whitehead's aggravated assault conviction merged into his malice murder conviction. Whitehead filed a motion for a new trial on November 19, 2018, and twice amended it. On July 25, 2019, the trial court denied the motion for a new trial. On August 6, 2019, Whitehead filed a notice of appeal. The appeal was docketed to the term beginning in December 2019 and submitted for decision on the briefs.

custodial statement and in refusing to excuse for cause the District Attorney from the panel of prospective jurors prior to the conclusion of voir dire. Because these claims lack merit, we affirm.

1. Viewed in the light most favorable to the jury's verdicts, the record shows the following. Whitehead and Larry grew up together and were close friends. At some point before the shooting, however, a rift had developed between the two. In the week prior to Larry's death, Whitehead had stopped by Larry's home several times, looking for him. On the day of the murder, he drove up to Larry's home with a gun on his lap. After learning that Larry was at the Stallion Motel, Whitehead drove there, accompanied by his friend, Ronald Giles. When Whitehead and Giles arrived at the motel, they found Larry with a woman, Lashawn Quarterman. Quarterman testified that, after Whitehead and Giles entered the motel room, the group drank and partied together. During their visit, Whitehead kept his gun visible and within reach. Although Larry also owned a handgun, he had put it away when he arrived at the motel earlier that day. According to Quarterman, shortly after Whitehead

arrived, he began pacing, sweating, and generally acting nervous and paranoid.

About an hour or so into their visit, someone knocked on the motel room door. Giles testified that, when the knock sounded, he was standing near the front door, and Whitehead and Larry were standing by the bathroom. Larry asked Quarterman to go into the bathroom, and she complied. Quarterman testified that, after closing the bathroom door, she heard "a big pop sound." Quarterman immediately walked out of the bathroom and saw Whitehead holding a gun, which he briefly pointed at her. Giles testified that, when the knock sounded, both Whitehead and Larry drew their weapons, but Larry pointed his gun toward the floor. Giles testified that he did not see Whitehead shoot Larry. Giles ran from the room, followed closely by Whitehead. Quarterman immediately called 911, and the police and paramedics arrived within minutes of her call.

When paramedics arrived, Larry was in critical condition. As they worked to secure Larry on a backboard, one of the paramedics moved a 9mm pistol lying near Larry's foot out of the way. The

paramedic testified that, in doing so, she did not touch the weapon's safety mechanism. An investigator testified that the pistol's safety was on and its chamber was empty. The police found a .45-caliber shell casing on the floor of the motel room and a Winchester .45-caliber pistol concealed beneath a bush outside the motel room. Ballistics testing confirmed that the .45-caliber shell casing had been fired from the pistol found beneath the bush. Forensic testing revealed that Whitehead's DNA was on the .45-caliber pistol.

Surveillance video recordings from the area showed Whitehead and Giles fleeing from the motel room. One recording showed Whitehead dropping to the ground briefly near the bush where the pistol was found. Whitehead and Giles were also captured on a video recording standing together shortly after the shooting at a nearby gas station. The police determined that a car found parked outside the motel was registered to Whitehead.

The day after the shooting, Whitehead called a detective and told him that he had witnessed the shooting and would come in later to help identify the shooter. Instead, the police arrested Whitehead.

After waiving his *Miranda*[2] rights, Whitehead gave a video-recorded statement. In his statement, Whitehead initially denied taking a gun with him to the motel room. He said that six or seven people were in the motel room and that a bald man standing outside the motel room fired at the group inside the motel room. Later in the interview, he blamed Giles for shooting Larry. He also claimed that the shooting was a "set-up" and that Giles shot Larry after the bald man knocked on the door and Larry looked out the window. At several points during the interview, the detective left Whitehead alone in the interview room. During these occasions, Whitehead can be heard on the video-recording arguing with himself and saying things like: "No, I ain't trippin' now. . . . I killed him off for this? . . . I killed Cuz." Later in the interview, Whitehead admitted that he had been using drugs and alcohol on the day of the shooting and that he had felt paranoid. He admitted shooting Larry, but claimed that he did so only after Larry pointed a gun at him: "[Larry] pulled his trigger and it clicked. . . . I shot him. . . . It was self-defense."

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Larry died as a result of a through-and-through gunshot wound to the head. According to the medical examiner, the bullet entered the skull above and behind the right ear and exited above the left eye. The bullet was not recovered.

Whitehead contends that this evidence supported his affirmative defense of self-defense and was insufficient to support his conviction for murder.[3] Whitehead, who did not testify, argues that he was the only one who saw Larry attempt to shoot him. He contends that neither the testimony of Giles nor Quarterman was sufficient to rebut his claim of self-defense because they did not see everything that transpired between him and Larry. Although neither witness saw Whitehead shoot Larry, their testimony nevertheless conflicts with Whitehead's statement in many significant respects. Giles and Quarterman testified that only four people were in the motel room when Larry was shot (Giles, Quarterman, Whitehead, and Larry) and that only two of them were

---

[3] Whitehead does not challenge the trial court's jury instructions concerning self-defense.

armed (Whitehead and Larry). Quarterman saw Whitehead holding a gun immediately after she heard a gunshot; Whitehead even briefly pointed the gun at her. Giles saw Larry with a gun when the shooting occurred, but Larry's gun was pointed at the floor. Further, the surveillance video recording confirms that only two people fled from the motel room after the shooting — Whitehead and Giles. The video also shows Whitehead stooping down by the bush where the .45-caliber pistol was found. Whitehead's DNA was on the weapon. Although Larry also had a gun, its safety was on. The jury could infer from the forensic evidence concerning the trajectory of the bullet through Larry's skull that Larry was looking away from Whitehead when he was shot. Given this evidence as well as evidence of Whitehead's paranoid behavior, drug and alcohol use, inconsistent statements, flight, and efforts to blame others for the shooting, the jury could reasonably infer that Whitehead's claim of self-defense was fabricated. See *Hoffler v. State*, 292 Ga. 537, 539 (1) (739 SE2d 362) (2013) ("Issues of witness credibility and the existence of justification are for the jury to determine, and it is free

to reject a defendant's claim that he acted in self-defense.").

The evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Whitehead guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("It [is] for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. Whitehead contends that the trial court erred in denying his motion to suppress his custodial interview because the detective improperly continued questioning him after he had invoked his right to remain silent. The record does not support Whitehead's contention.

"When reviewing a trial court's decision on a motion to suppress evidence of a defendant's custodial statement to investigators, we must accept the factual findings and credibility determinations of the trial court unless clearly erroneous." (Citation

and punctuation omitted.) *State v. Smith*, 299 Ga. 901, 903 (2) (792 SE2d 677) (2016). But "where controlling facts are not in dispute, such as those facts discernible from a videotape, our review is de novo." (Citation and punctuation omitted.) *Vergara v. State*, 283 Ga. 175, 178 (1) (657 SE2d 863) (2008). We look to the "totality of the circumstances" to determine whether a defendant has waived his rights under *Miranda* and whether his incriminating statements to the police were voluntary. *Bunnell v. State*, 292 Ga. 253, 255 (2) (735 SE2d 281) (2013).

So viewed, the record shows that the trial court conducted a *Jackson-Denno*[4] hearing prior to trial concerning the admissibility of Whitehead's custodial statement. The trial court reviewed the video-recorded interview and heard testimony from the detective who interviewed Whitehead. The detective testified that he read a *Miranda* waiver-of-rights form to Whitehead. Whitehead said that he understood his rights and that he did not want to talk to the police. He also checked a box on the form indicating that he was

---

[4] *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

choosing to remain silent. The recording shows that the detective stopped questioning Whitehead as soon as Whitehead expressed his reluctance to talk with him. Instead of remaining silent, however, Whitehead began asking the detective argumentative questions about the grounds for his arrest. As the detective prepared to leave, Whitehead continued asking questions, including: "How did I become a suspect? I'm not understanding." The detective responded: "If you're choosing not to talk, I can't really get into it with you." The detective gave Whitehead his card in case he changed his mind. Whitehead said "I don't mind talking about it," and he began explaining his version of events, to which the detective responded "uh-huh." The detective told Whitehead that he had been arrested based on the statements that they had obtained from other witnesses, but that if he wanted to explain himself, he was free to do so. Whitehead then said: "I want to tell you everything." When Whitehead reiterated that he wanted to give his account of events, the detective resumed asking him questions. Most of the interview consists of Whitehead talking rapidly, recounting his often-changing

version of events. At no point thereafter did Whitehead stop the interview, ask for a lawyer, or express a desire to remain silent.

The trial court denied Whitehead's motion to suppress the custodial interview, finding that he had agreed to talk with the detective after being given *Miranda* warnings. The court concluded that although Whitehead had initially declined to speak with the detective, he immediately changed his mind and unambiguously expressed his desire to speak with the detective and that his resulting statement was made freely, voluntarily, and without any hope of benefit or fear of injury.

The record shows that the detective honored Whitehead's right to remain silent and did nothing to pressure or encourage Whitehead to speak with him. Rather, after initially invoking his right to remain silent, Whitehead immediately changed his mind and expressed an unequivocal desire to talk about the shooting. Thereafter, Whitehead did not reassert his desire to remain silent or ask for a lawyer. Under these circumstances, the trial court did not err in admitting Whitehead's custodial statement into evidence.

See *Morgan v. State*, 275 Ga. 222, 223-224 (4) (564 SE2d 192) (2002) (The defendant's custodial statement was admissible when, although he initially invoked his right to remain silent after signing a waiver of rights form, the defendant immediately changed his mind and "clearly evince[d] his intent not to remain silent," and "there was never an attempt [by the officer] to wear down his resistance and make him change his mind." (citation and punctuation omitted)).

3. Whitehead contends that the trial court erred in allowing the District Attorney to participate in voir dire as a prospective juror instead of immediately excusing her for cause. Whitehead argues that the District Attorney's presence on the venire of prospective petit jurors "created a substantial appearance of impropriety." He contends that, even though the trial court ultimately excused her for cause, the damage to the integrity of the process had been done, which denied him a fair trial.

The trial transcript shows that, before the trial court excused her for cause, the District Attorney answered a few preliminary

questions. She stated that she was familiar with the facts of the case, knew the attorneys and the judge, owned a gun, had a relative in law enforcement, and was familiar with the motel where the crimes occurred. Whitehead has not shown that anything that the District Attorney did or said before she was excused for cause was inherently prejudicial and would have denied him the right to a jury free from a fixed opinion or a suspicion of prejudgment. Rather, he argues that the District Attorney's mere presence on the venire infected the integrity of the jury selection process, thereby denying him a fair trial. He has cited no authority in support of that proposition, nor have we found any.

Generally, the dismissal of a jury panel is required when, during voir dire, a prospective juror relays prejudicial information that is "specific to the defendant and germane to the case for which the defendant is on trial. Dismissal is not required, however, when the statements establish only gossamer possibilities of prejudice." (Citations and punctuation omitted.) *Williams v. State*, 248 Ga. App. 111, 112 (1) (545 SE2d 669) (2001). See also *Sharpe v. State*, 272 Ga.

684, 688 (5) (531 SE2d 84) (2000) (When a juror makes remarks heard by other prospective jurors, the proper inquiry is whether those remarks were inherently prejudicial and deprived the defendant of his right to begin the trial with a jury free from even a suspicion of prejudgment or fixed opinion. And where the facts establish only "gossamer possibilities of prejudice, prejudice is not inherent." (citations and punctuation omitted)). Because there is nothing in the voir dire transcript suggesting that the District Attorney relayed to the prospective jurors any prejudicial information specific to the defendant or germane to the case being tried, Whitehead has failed to demonstrate any basis for reversal.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 4, 2020 --- RECONSIDERATION DENIED JUNE 1, 2020.
Murder. Chatham Superior Court. Before Judge Morse.
*David T. Lock*, for appellant.
*Meg E. Heap, District Attorney, Abigail B. Long, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.