312 Ga. 386
FINAL COPY

S21A1171.  WILLIAMS v. THE STATE.

ELLINGTON, Justice.

A DeKalb County jury found Leon Williams guilty of malice murder, terroristic threats, and three counts of cruelty to children in connection with the drowning death of his ten-year-old son, Kentae Williams ("Kentae").[1] Williams contends that the evidence presented at trial was insufficient to support his convictions. He also

_____

[1] Kentae drowned on April 28, 2017. In connection with Kentae's death, a DeKalb County grand jury indicted Williams on September 14, 2017, for malice murder (Count 1); felony murder based on cruelty to children, as alleged in Count 3 (Count 2); three counts of cruelty to children in the first degree (Counts 3-5); and making terroristic threats (Count 6). Williams's trial commenced on July 9, 2018, and the jury found him guilty on all counts. On August 3, 2018, the trial court sentenced Williams to life in prison without parole for malice murder, to a twenty year prison term for each count of cruelty to children, and to a five year prison term for terroristic threats. The sentences are to be served consecutively. The felony murder count was vacated by operation of law. Williams filed a timely motion for a new trial on August 31, 2018, which he amended on March 11, 2020. The trial court held a hearing on Williams's amended motion on March 13, 2020, and denied it on April 8, 2020. Williams filed a motion for an out-of-time appeal on February 15, 2021, which was granted the following day. Williams filed a notice of appeal on February 26, 2021, and this case was docketed to the August 2021 term and submitted for a decision on the briefs.

argues that one of his three convictions for cruelty to children must be vacated because it merged with his malice murder conviction. For the following reasons, we affirm.

Kentae, a child with autism and special needs, spent most of his life in foster care. Williams began providing care for Kentae in June 2016, and he adopted the child on November 19, 2016. During the week of April 24, 2017, Williams attended a work conference. While Williams was away, his mother stayed in Williams's apartment and cared for Kentae.

During the morning of Thursday, April 27, one of Williams's fellow conference attendees observed Williams as he talked on the phone. She testified that Williams was visibly upset. He repeatedly said: "I'm going to show him. My son thinks he's funny. I'm going to show him." Williams was upset that his son was misbehaving at school. The conference ended the following day.

Between 6:00 p.m. and 7:00 p.m. on April 28, Williams's neighbors saw Williams walking with Kentae toward their DeKalb County apartment. Neighbors described Williams's demeanor as

2

"aggressive," "tense," and "furious." They saw Williams holding Kentae by the neck. The neighbors testified that, as Williams passed by them with the child in tow, he complained that Kentae had kicked his teacher and used obscene language. Williams told Kentae twice that he was "going to die tonight." He also said "I'm going to beat him up. I'm going to kill him." The neighbors observed that Kentae appeared terrified. The child held a bag with a belt in it, and one of the neighbors asked: "You have him holding his own butt whipping?" Williams said "yes," explaining that he had just bought the belt. One neighbor testified that she found the exchange so disturbing that she considered calling the police.

Williams's mother testified that, as she sat in the living room watching television, she saw Williams and Kentae enter the apartment. She heard Williams tell Kentae to go upstairs and take a bath. Shortly thereafter, she heard a cry, and she went upstairs to investigate. Kentae, who was sobbing, was standing up in a tub filled with about six inches of water. Williams sat next to the child. Williams's mother assumed that Kentae did not want to take a bath,

so she went back downstairs to watch television. Later, Williams called out to his mother, asking her to come upstairs. When she got upstairs, she saw Kentae lying on his bedroom floor, near the door to the bathroom. Williams was giving the child CPR.

Williams's mother called 911 at 8:18 p.m. When first responders arrived at 8:27 p.m., Williams was in the upstairs bedroom attempting to revive Kentae with chest compressions. A paramedic testified that she continued CPR in the ambulance, but Kentae had no pulse. It was difficult to intubate Kentae because his mouth was clenched tightly and he had water in his trachea and lungs. Efforts to revive him with epinephrine failed. The paramedic noticed bruising on Kentae's head, torso, and arms. Also, the skin on the top of Kentae's feet was peeling and beginning to slough away. The paramedic noticed that Kentae's blood was pooling toward his back and his feet were starting to stiffen, as if rigor mortis had begun to set in, which typically happens about two hours after death. On the way to the hospital, Williams told the paramedic that he had left Kentae in the bathroom to change clothes, and that when

4

he returned to help him bathe, Kentae was unresponsive. According to the paramedic, Williams repeatedly complained that "DFCS isn't going to give me another kid now." Once at the hospital, a doctor pronounced Kentae dead. Several people told Williams to stay at the hospital, but he left.

Kentae's death was determined to be a homicide caused by drowning. The emergency room doctor noted that Kentae's body temperature upon arrival at the hospital was about 102 degrees, warmer than it should have been, which was consistent with his body being left in a warm bath for an extended period of time. The medical examiner testified that Kentae's treatment records indicated that rigor mortis had begun to set in when the paramedics arrived, which meant that he had probably been dead for approximately two hours.

Both the emergency room doctor and the medical examiner noticed that Kentae had blisters from recent second degree burns on the tops of his feet, but not on the soles of his feet. He had circular bruises on his calves, which the medical examiner testified could

5

have been caused by someone grasping Kentae's calves in order to hold his feet under the hot water spigot, which could also explain why the burns were only to the tops of his feet. Kentae also had a recent deep bruise on his shoulder, which was consistent with someone forcefully pressing him under the water. The medical examiner testified that it would have taken about two to three minutes to drown the child. Additionally, Kentae had recent, extensive, and deep bruising and a pattern of marks on his body consistent with being struck repeatedly by a belt and a belt buckle. The police collected seven belts from Williams's apartment. While in the apartment, they noticed that the tub's cold-water knob was missing.

Williams was arrested a few hours after Kentae was pronounced dead. Williams spoke with a detective shortly after his arrest, and his recorded custodial interview was played for the jury. Williams first said that, when he got back from the conference on Friday, he picked Kentae up from school, went to a Family Dollar store, and encountered neighbors on the way home. He told Kentae

to take a bath when they returned to the apartment. Williams said he walked out of the bathroom around 8:15 p.m. to change clothes, and when he came back about five minutes later, he found Kentae lying on his side in the tub, unresponsive. After Williams gave his account, the investigator ended the interview.

Moments later, Williams asked to continue the interview, and the detective agreed. Williams admitted turning the hot water on and running it over Kentae's feet, but claimed that he turned it off when the child complained that it was too hot. Williams admitted that the bruising on Kentae's body was the result of his striking the child five times with a belt. He also admitted holding Kentae down underwater, twice. Williams explained that Kentae was "swimming," and that he twice pushed him down under the water for 30 to 45 seconds, which he acknowledged was too long, and that his actions could have caused Kentae's death. Williams also admitted to making a "joke" to his neighbors that he was going to kill Kentae that night.

1. Williams contends that the State's evidence was insufficient

7

to support his convictions by proof beyond a reasonable doubt. With respect to his conviction for murder, Williams also argues that the State's evidence was entirely circumstantial and failed to exclude every other reasonable hypothesis save that of his guilt. For the following reasons, these contentions are without merit.

When evaluating a challenge to the sufficiency of the evidence as a matter of constitutional due process, this Court views all of the evidence presented at trial in the light most favorable to the verdicts and asks whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). Even assuming that the evidence presented on the offense of murder was wholly circumstantial, as Williams argues, to sustain the conviction as a matter of Georgia statutory law,

> the proven facts had to be consistent with the hypothesis of his guilt and exclude every reasonable hypothesis save that of his guilt. Not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that

are reasonable. The reasonableness of an alternative hypothesis raised by a defendant is a question principally for the jury, and when the jury is authorized to find that the evidence, though circumstantial, is sufficient to exclude every reasonable hypothesis save that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law.

(Citation and punctuation omitted.) *Cochran v. State*, 305 Ga. 827, 829 (1) (828 SE2d 338) (2019). See also OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused.").

(a) *Malice murder*. Williams contends that the State's evidence failed to prove beyond a reasonable doubt that he committed malice murder by drowning Kentae.[2] He also argues that the evidence supports two other possibilities: that Kentae's death was either an accident or a suicide. We disagree.

The evidence was sufficient for the jury to conclude that

---

[2] "A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a).

9

Williams drowned Kentae with malicious intent. Williams told several people that Kentae was "going to die tonight." He was so furious with Kentae for misbehaving at school that he beat the child and held his feet beneath scalding water. Williams also admitted that he pressed Kentae beneath the water twice for long periods of time. There is no evidence that anyone other than Williams was with Kentae when the child drowned. The medical examiner testified that some of the bruises Kentae sustained were consistent with someone forcefully holding him beneath the water. Kentae's body was also in rigor mortis when the paramedics arrived, which supports an inference that Kentae died shortly after Williams started the child's bath, sometime between 6:00 p.m. and 7:00 p.m. Williams claimed, however, that Kentae was still alive at 8:00 p.m., shortly before Williams's mother called 911. The jury could reasonably infer from that evidence that Williams delayed calling 911 and that he did so because he knew that he had killed Kentae and he was trying to conceal evidence of his guilt. See *Whitehead v. State*, 308 Ga. 825, 828 (1) (842 SE2d 816) (2020) (given the forensic and other evidence

10

concerning how the crime occurred, the jury could reasonably infer that the defendant's account was fabricated). Further, the medical examiner concluded that the manner of Kentae's death was homicide.

Given the evidence in this case, the jury was not required to find that Williams's alternate hypotheses about Kentae's manner of death were reasonable. See, e.g., *Guzman-Perez v. State*, 310 Ga. 573, 576-577 (1) (853 SE2d 76) (2020); *Collett v. State*, 305 Ga. 853, 855-856 (1) (828 SE2d 362) (2019). Instead, the jury was authorized to infer that Williams attempted to conceal the manner of Kentae's death and initially lied to the paramedics and police because he had committed the murder. See *Brown v. State*, 291 Ga. 887, 888 (1) (734 SE2d 41) (2012) (criminal intent is a question for the factfinder, and can be inferred from the defendant's conduct before, during, and after the commission of the crimes). Accordingly, the evidence was sufficient to support Williams's murder conviction.

(b) *Cruelty to children*. Williams argues that the evidence does not prove beyond a reasonable doubt that he committed the offenses

11

of cruelty to children in the first degree by drowning Kentae (Count 3), by holding Kentae's feet under hot water (Count 4), or by whipping Kentae with a belt (Count 5).[3] We disagree.

As to Count 3, Williams admitted that he held Kentae beneath the water twice for prolonged periods, and the evidence, as recounted in Division 1 (a), supports the jury's finding that Williams drowned Kentae with malicious intent. As to Count 4, Williams argues that, given his testimony that he turned the water off as soon as Kentae complained that it was too hot, he accidentally instead of maliciously injured the child. The jury was authorized to disbelieve

---

[3] "Any person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (b). Further,

> [f]or purposes of this Code section, malice in the legal sense[ ] imports the absence of all elements of justification or excuse and the presence of an actual intent to cause the particular harm produced, or the wanton and wilful doing of an act with an awareness of a plain and strong likelihood that such harm may result. Intention may be manifest[ed] by the circumstances connected with the perpetration of the offense. [I]ntent [is] a question of fact to be determined upon consideration of words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted.

(Citation and punctuation omitted.) *Stokes v. State*, 204 Ga. App. 586, 587-588 (2) (420 SE2d 84) (1992).

Williams and rely, instead, on the medical examiner's testimony that Kentae's injuries — second degree burns to the top of his feet and bruises to his calves — were consistent with a person holding the child's feet under hot water long enough for them to blister. And, with respect to Count 5, Williams argues his whipping Kentae was neither malicious nor excessive; rather, it was appropriate discipline. The evidence, however, authorized the jury to conclude not only that Williams struck Kentae hard enough with a belt and belt buckle to cause significant bruises, but also that Williams had Kentae carry the instrument of his punishment while being subjected to death threats.

This evidence was sufficient to support Williams's convictions for cruelty to children beyond a reasonable doubt. The jury could infer from the evidence that Williams's acts caused Kentae excessive physical and mental pain and that they were unreasonable and unjustified. The jury was charged on justification in the context of parental discipline, but it rejected that defense, which it was entitled to do. See, e.g., *Leslie v. State*, 341 Ga. App. 731, 734 (1) (802 SE2d

13

674) (2017) (it is for the jury to decide whether the defendant's actions constituted reasonable parental discipline under the circumstances); *Haji v. State*, 331 Ga. App. 116, 119 (3) (769 SE2d 811) (2015) (same). See also *Goodson v. State*, 305 Ga. 246, 248 (1) (b) (824 SE2d 371) (2019) ("Questions about the existence of justification are for the jury to resolve, and the jury may reject any evidence in support of a justification defense and accept evidence that [the act constituting the crime was not justified].").

(c) *Terroristic threats.* Williams contends that his statements that he was going to kill Kentae did not constitute the crime of making terroristic threats; rather, they were "poorly phrased" promises of discipline. We disagree.

"A person commits the offense of a terroristic threat when he or she threatens to . . . [c]ommit any crime of violence . . . [w]ith the purpose of terrorizing another[,]" and "[n]o person shall be convicted under this subsection on the uncorroborated testimony of the party to whom the threat is communicated." OCGA § 16-11-37 (b). The indictment accused Williams of unlawfully threatening "a crime of

14

violence" against Kentae "with the purpose of terrorizing" him with a threat "that suggested the death of said victim." Accordingly, as indicted, the State was required to prove that (1) Williams had threatened Kentae with a violent crime that suggested his death, and (2) that he did so with the purpose of terrorizing the child. See *Bryant v. State*, 306 Ga. 687, 690 (1) (a) (832 SE2d 826) (2019); *Martin v. State*, 303 Ga. App. 117, 119 (1) (692 SE2d 741) (2010). "The crime of making terroristic threats focuses solely on the conduct of the accused and is completed when the threat is communicated to the victim with the intent to terrorize." (Citation and punctuation omitted.) *Clement v. State*, 309 Ga. App. 376, 379 (1) (710 SE2d 590) (2011).

The State presented sufficient evidence to allow the jury to find these elements beyond a reasonable doubt. Witnesses heard Williams threaten to beat and to kill Kentae, telling the child that he was "going to die tonight." Murder is, of course, a violent crime. See OCGA § 16-5-1 (a). The jury could infer that the threats of violence were made to terrorize the child and that they were not

15

merely poorly phrased promises of parental discipline given the following evidence: Kentae was a ten-year-old child; the threats were made in anger; witnesses testified that Kentae was, in fact, terrified; and one witness was so disturbed by the threats that she considered calling the police. Given this evidence, a rational trier of fact was entitled to find Williams guilty beyond a reasonable doubt of the offense of making terroristic threats. See *Clement*, 309 Ga. App. at 381 (1) (b).

2. Contrary to Williams's assertion, the trial court correctly sentenced Williams on his conviction for cruelty to children by drowning (Count 3). That conviction does not merge with Williams's murder conviction because the two crimes contain mutually exclusive elements. See *Linson v. State*, 287 Ga. 881, 885-886 (4) (700 SE2d 394) (2010) ("[E]ach crime requires proof of at least one additional element which the other does not. . . . Furthermore, the crimes of malice murder and cruelty to children are not so closely related that multiple convictions are prohibited under other provisions of OCGA §§ 16-1-6 and 16-1-7. Accordingly, even if the

16

same conduct establishes the commission of both malice murder and cruelty to children, the two crimes do not merge." (citations and punctuation omitted)); see also *Vasquez v. State*, 306 Ga. 216, 234-235 (4) (830 SE2d 143) (2019) (rejecting defendant's argument that cruelty to children in the first degree should have merged with his malice murder conviction, citing *Linson*); *Walker-Madden v. State*, 299 Ga. 32, 37 (3) (785 SE2d 879) (2016) (vacating sentencing order wherein defendant's conviction for cruelty to children in the first degree was merged with malice murder, noting the counts do not merge); *Collum v. State*, 281 Ga. 719, 724 (6) (642 SE2d 640) (2007) (cruelty to children felonies did not merge with malice murder as a matter of law or fact).

*Judgment affirmed. All the Justices concur.*

Decided September 8, 2021.

Murder. DeKalb Superior Court. Before Judge Coursey, Senior Judge.

*Charles H. Frier*, for appellant.

*Sherry Boston, District Attorney, Deborah D. Wellborn, Elizabeth H. Brock, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.