319 Ga. 402
FINAL COPY

S24A0025. ZAYAS v. THE STATE.

COLVIN, Justice.

Appellant Christopher Vargas Zayas appeals his convictions for malice murder and a related crime in connection with the shooting death of his girlfriend, Carly Andrews.[1] On appeal,

---

[1] The shooting occurred on September 6, 2018. On September 24, 2018, a Hall County grand jury indicted Appellant for malice murder (Count 1), felony murder (Count 3), aggravated assault, family violence (Count 4), possession of marijuana with intent to distribute (Count 6), and three counts of possession of a firearm during the commission of a felony (Counts 2, 5, and 7), which were predicated on the crimes alleged in Counts 1, 4, and 6, respectively. Appellant moved to sever Counts 6 and 7 for trial, and the court granted the motion. Appellant was then tried on Counts 1 through 5 from November 8 through 18, 2021, and the jury found him guilty on all five counts. The jury also found Appellant not guilty of involuntary manslaughter as a lesser included offense of either malice murder or felony murder predicated on aggravated assault. Appellant was sentenced to life in prison with the possibility of parole for Count 1 plus five years consecutive for Count 2. The trial court merged Count 4 with Count 1 and Count 5 with Count 2 for sentencing purposes and vacated Count 3 by operation of law. Counts 6 and 7 were then transferred to the dead docket. Appellant timely filed a motion for new trial on December 20, 2021, and amended the motion through new counsel on June 30, 2022. After holding a hearing on the amended motion for new trial on July 6, 2022, the trial court denied the motion on December 30, 2022. Appellant then filed a notice of appeal directed to this Court. But we dismissed the appeal, noting that the case was still pending in the trial court because Counts 6 and 7 had been transferred to the dead docket. After the State nolle prossed Counts 6 and 7, the trial court entered a final disposition of the case

Appellant argues that the circumstantial evidence at trial was insufficient under OCGA § 24-14-6 to exclude the alternative hypothesis that the pistol discharged accidentally as Andrews grabbed it. Appellant also argues that trial counsel was ineffective for failing to move to suppress statements Appellant made to investigators at the police station before he received *Miranda* warnings.[2] Finally, Appellant asserts several enumerations of trial court error and ineffective assistance of counsel in connection with the trial court's jury charge on unlawful act involuntary manslaughter. As explained below, we conclude that the circumstantial evidence authorized the jury to reject Appellant's alternative hypothesis as unreasonable, that trial counsel was not deficient for failing to seek to suppress Appellant's statements to investigators at the police station, and that Appellant suffered no prejudice from any instructional error. Accordingly, we affirm.

---

on April 12, 2023. Appellant then timely filed an amended notice of appeal. The appeal was assigned to this Court's term beginning in December 2023 and submitted for a decision on the briefs.

[2] See *Miranda v. Arizona*, 384 U. S. 436, 444-445 (86 SCt 1602, 16 LE2d 694) (1966).

1. The trial evidence showed the following.[3] In September 2018, Appellant and Andrews lived together in an apartment in Gainesville, Georgia. Danielle Gosnell, who lived in an apartment on the same floor, testified that Appellant and Andrews frequently engaged in loud arguments and that, on the day of the shooting, she heard Appellant and Andrews arguing "so loud it sounded like they were arguing in [Gosnell's] apartment." Gosnell testified that she heard a gunshot, and that, "right before the gunshot, like immediately before," Andrews "screamed really loud." Gosnell said that she dialed 911 and then went out into the hallway, where she saw Appellant outside his apartment screaming for help and saying that it was an accident and that Andrews shot herself.

Officer Justin Seabolt, who was the first officer on the scene, testified that, when he entered through Appellant's open apartment

---

[3] Because this case involves questions of harmless error and prejudice under *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984), "we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Moore v. State*, 315 Ga. 263, 264 (1) n.2 (882 SE2d 227) (2022) (citation and punctuation omitted).

doorway, Appellant was leaning over Andrews and either holding pressure on the wound or doing CPR. Officer Seabolt further testified that he observed a pistol on the dining room table with the slide locked to the rear and no magazine inserted.

Officer Seabolt's body camera footage, which was played for the jury, and photographs from the crime scene corroborated Officer Seabolt's testimony. The body camera footage further showed that officers asked Appellant to exit the apartment and stand on a landing outside, where he gave an account of the incident prior to being handcuffed. In his statement, Appellant reported that the gun was a 9mm Baby Desert Eagle, that Andrews had been helping him clean the gun, and that, after the magazine had been removed, Andrews grabbed the gun and held it so it was pointed toward herself. Although Appellant initially stated that Andrews had pulled the trigger, he later said that the gun fired when Andrews cocked it.

Investigator Stephen Johnson, who was assigned to the case, testified that, although Appellant was not under arrest, and contrary to standard operating procedures, Appellant was

handcuffed after giving his statement to police officers at the scene, and Appellant was then transported in a marked patrol car to the Gainesville Police Department for an interview. Investigator Johnson testified that he interviewed Appellant for about an hour and a half over a seven-hour period at the police station.

The police-station interview, which was video recorded and played for the jury, was divided into three parts separated by breaks in questioning. Investigator Johnson, who was accompanied by another investigator, began the first part of the police-station interview by apologizing to Appellant for how he had been transported to the police department and telling him that he was not under arrest and was free to leave at any time. Investigator Johnson then reiterated to Appellant that he was not under arrest before conducting the second part of the interview. At the beginning of the third and final part of the interview, Investigator Johnson advised Appellant of his *Miranda* rights for the first time, and Appellant signed a written waiver of his rights.

The recordings show that, throughout the interview, Appellant

5

consistently claimed that he had been cleaning the gun and had given it to Andrews because she wanted to help him. But he gave several accounts of how events unfolded from that point forward. During the first part of the interview, Appellant said that Andrews grabbed the gun out of his hands, pointed it at herself, and tried to "cock it back" to see if a bullet was in the chamber. But Appellant said she did not have enough force to do so, and, when she let go, the gun went "boom" and fired at her. Appellant further said that the magazine was on the table when the gun fired and that he put the gun back on the table after the shooting.

The recording shows that Investigator Johnson asked Appellant if he would be willing to have his hands tested for gunshot residue, and Appellant agreed to do so. The investigators then left the room, at which point Appellant looked at his right hand and then spent approximately 30 seconds wiping his right hand on his shorts, licking his hand and wiping it on his shorts, and then using the

bottom portion of his shirt to wipe his hand.[4]

During the second part of the interview, Appellant said that, before the shooting, he had taken the magazine out of the gun, cleared the chamber, put the magazine back in the gun, charged it, and then given it to Andrews. At different points, Appellant said both that the slide was open and that the slide was closed when Andrews took the gun from him. Appellant continued to claim that he put the gun on the table after the shooting, but he denied manipulating the gun in any other way. Appellant also said that Andrews was pretty far away from him when the gun fired.

During this final portion of questioning, after waiving his *Miranda* rights, Appellant said that the gun's slide was closed when he put it on the table after the shooting, and that he did not open the slide after the shooting. Appellant also gave several different accounts of how Andrews had been shot, claiming that both he and Andrews were holding the gun when it fired, then that the gun fired

---

[4] Appellant's hands were later swabbed for purposes of conducting a gunshot residue test, and, as noted below, the test results were positive for the presence of gunshot primer residue.

while he was holding it after Andrews gave it back to him, then that the gun fired when he inserted a cleaning rod into the barrel, then that the gun went off without him pulling the trigger when he put it down on the table, and finally that the gun fired when he pulled the hammer back and let it go. When told that the investigators were just trying to understand why Appellant had shot Andrews, Appellant responded, "It was an accident. I didn't shot [sic] Carly 'cause I want to. The gun went off on the table, and it hit her. That's it. I never pointed it at her." He further admitted that "I shot her, okay." Investigator Johnson then informed Appellant that Andrews had died, and the recording shows Appellant appearing to cry for some time, although Investigator Johnson testified that he did not see any actual tears.

The medical examiner testified that the gunshot wound to Andrews's chest would have been "rapidly fatal," killing her in "seconds to minutes." He testified that the bullet entered Andrews's chest at a slightly downward angle, consistent with her bending over while standing, and that the bullet had traveled through her heart

8

and lung before exiting through her back.

A crime scene specialist found a bullet defect in the wall above the television and recovered the bullet on the floor behind the drywall. She testified that forward blood spatter indicated that Andrews was near the television stand when she was shot, that impact spatter from Andrews falling down was found on the television stand, and that a laser reconstruction of the bullet's trajectory indicated that the bullet had traveled from the direction of the dining room table, which was several feet away from the television stand. On the table, officers found the Baby Desert Eagle with blood on it and the slide locked to the rear, as well as the gun's magazine, a live cartridge, and a gun cleaning brush. A spent shell casing was recovered from the floor "back and to the right" of the table. The crime scene specialist observed transfer blood stains on the wall next to the table, as well as on the apartment's front door.

The State's gunshot residue expert testified that, when a pistol is fired, gunshot primer residue is ejected through the barrel, as well as through the ejector portion of the slide. He testified that both

9

Appellant's and Andrews's hands tested positive for the presence of gunshot primer residue, with Andrews having a higher level of such particles on her hands. He further testified that gunshot primer residue is found on victims in 80 to 90 percent of shootings. And he said that licking hands or rubbing them on any surface would cause a loss of gunshot residue particles.

The State's firearms examiner testified that the Baby Desert Eagle was a double-action, single-action semiautomatic pistol with an exposed hammer. She testified that the pistol's slide would be locked open only if the last round was fired with the magazine inserted or if the slide lock was manually engaged. Although she discovered some dirt and rust on the gun, she opined that the gun was "operating as it was designed" after test firing the gun, performing a "check function test," and performing "bump-off" and "push-off" tests, which revealed no detonations when force was applied to the hammer. She testified that she had not formally performed an "abuse test," which she described as a test used to determine if a gun can fire without the trigger being pulled. But she

said that, during her testing, she had done everything an "abuse test" would require for a gun like the Baby Desert Eagle. When asked on cross-examination, she further testified that it might be possible for the slide lock to be manually engaged following a discharge while the slide was cycling.

The defense's expert on firearms, ballistics, and gunpowder residue reviewed the report prepared by the State's firearms examiner and testified, based on that report, that the Baby Desert Eagle was not functioning as designed because de-cocking the gun with the safety caused light firing-pin indentations on cartridge primers, indicating that an accidental discharge was possible. He testified that the gun had been poorly maintained because there was evidence of corrosion and rust. He further said that he found it significant that Andrews had more gunshot primer residue on her hands than Appellant had on his hands because gunshot primer residue only comes out of the ejection port, not the barrel, and it travels a couple feet at most. In addition, he opined that, if someone were grabbing the gun and placing upward pressure on the slide lock

11

while the gun fired, the slide lock could be engaged, preventing the slide from moving forward.

2. On appeal, Appellant challenges the sufficiency of the trial evidence under OCGA § 24-14-6, which provides that, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." Appellant argues that the State's purely circumstantial evidence that Appellant shot Andrews with malice aforethought was insufficient to exclude the reasonable hypothesis that the gun discharged accidentally as Andrews reached toward the desk and grabbed the gun perpendicular to her body. We disagree.

"[W]here the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law." *Perrault v. State*, 316 Ga. 241, 246 (1) (887 SE2d 279) (2023) (citation and punctuation omitted). Here, the trial evidence was more than

12

sufficient to authorize the jury to reject Appellant's alternative hypothesis as unreasonable. Appellant admitted to investigators that he shot Andrews. The forensic evidence and expert testimony supported jury findings that Andrews was shot from the dining room table while she was standing several feet away near the television stand. And Gosnell testified that the gunshot occurred during a loud argument between Appellant and Andrews and immediately after Andrews "screamed really loud." Evidence showing that officers found the gun on the table with the magazine removed and the slide locked to the rear — despite evidence that the slide would be locked back only if the slide lock was manually engaged or the last round was fired with the magazine inserted — supported an inference that Appellant manipulated the gun after the shooting in an effort to make the shooting look like it had occurred accidentally in the process of cleaning the gun. The video recording of Appellant's interview at the police department, which showed Appellant licking and wiping his right hand after being asked to submit to a gunshot residue test, further supported a jury inference that Appellant was

attempting to cover up his involvement in shooting Andrews. Finally, the jury was authorized to reject Appellant's accidental-shooting hypothesis as unreasonable based on Appellant's multiple, inconsistent accounts of how the shooting had occurred. See, e.g., *Williams v. State*, 312 Ga. 386, 390-391 (1) (a) (863 SE2d 44) (2021) (jury was authorized to reject as unreasonable the alternative hypothesis that the victim's death was an accidental drowning where the trial evidence supported "infer[ences] that [the appellant] attempted to conceal the manner of [the victim's] death and initially lied to the paramedics and police because he had committed the murder"); *Davenport v. State*, 309 Ga. 385, 388-389 (1) (846 SE2d 83) (2020) (jury was authorized to find unreasonable the alternative hypothesis that the victim shot herself where "evidence suggested that the crime scene had been staged," investigators "found gunshot primer residue on [the appellant's] clothes," and the appellant "gave inconsistent stories to police"). Cf. *Perrault*, 316 Ga. at 246-247 (1) (the evidence was sufficient for the jury to reject an alternative suicide hypothesis as unreasonable where "the magazine was out of

14

the gun and placed on the opposite side of [the victim's] body from the gun").

Appellant highlights inconsistencies in the evidence, as well as evidence that was consistent with his alternative hypothesis. But "it is axiomatic that resolving evidentiary conflicts and assessing witness credibility are within the exclusive province of the jury." *Perrault*, 316 Ga. at 247 (1) (citation and punctuation omitted). "And it is the jury's role to determine whether an alternative hypothesis raised by the defendant is reasonable." Id. (citation and punctuation omitted). Accordingly, this claim fails.

3. Appellant argues that trial counsel was constitutionally ineffective for failing to move to suppress the statements Appellant made to investigators at the police station before he received *Miranda* warnings. We conclude, however, that Appellant has failed to establish deficient performance.

To prevail on an ineffective-assistance-of-counsel claim, a defendant must show deficient performance by trial counsel and resulting prejudice. See *Strickland v. Washington*, 466 U. S. 668,

687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "Proving deficient performance requires a defendant to show that no reasonable lawyer would have done what his lawyer did or would have failed to do what his lawyer did not." *Payne v. State*, 318 Ga. 249, 258 (5) (897 SE2d 809) (2024) (citation and punctuation omitted). "To show prejudice, a defendant must show that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." Id. (citation and punctuation omitted). If a defendant fails to establish either deficient performance or prejudice, we need not address the other part of the *Strickland* test. See id.

At the motion-for-new-trial hearing, trial counsel testified that it was "arguably correct" that the only way to present the accident defense without having Appellant testify was to allow admission of Appellant's statements at the police station. According to trial counsel, this was because, although the body camera footage from the scene captured some comments Appellant made about the events, "the in-custody statement certainly fleshed out the exact sequence of events in this case from his standpoint." Trial counsel

16

further testified that "[t]he decision not to move to suppress a statement in this particular case was because" Appellant was repeatedly told he was not under arrest during his police-station interview, and he did not think a motion to suppress would be granted.

In ruling on Appellant's motion for new trial, the trial court concluded that Appellant had shown neither deficient performance nor prejudice for this claim. The trial court noted that investigators had repeatedly told Appellant that he was not under arrest during the police-station interview and that the court "would have been unlikely to suppress" Appellant's statements if he had filed a motion to suppress. The court further concluded that trial counsel had pursued a reasonable defense strategy in choosing not to oppose admission of Appellant's statements because those statements allowed Appellant to introduce the defense theory of accident without Appellant having to testify at trial.

Here, Appellant has not shown that "no reasonable lawyer would have" foregone a motion to suppress the portion of Appellant's

interview at the police station before he received *Miranda* warnings. *Payne*, 318 Ga. at 258 (5) (citation and punctuation omitted). As trial counsel testified at the motion-for-new-trial hearing, admitting Appellant's police-station interview allowed counsel to introduce Appellant's version of events in more detail and in his own words without Appellant having to testify and be subjected to cross-examination. And a review of the video recording of the police-station interview shows that, prior to receiving *Miranda* warnings, Appellant was indeed able to elaborate on the cursory description of events that he had given to officers on the scene. See *Winters v. State*, 303 Ga. 127, 131 (II) (A) (810 SE2d 496) (2018) (no deficient performance in consenting to the introduction of the appellant's "previously-suppressed" statement to police officers where doing so allowed counsel "to present [the appellant's] defense to the jury, in [her] own words, without subjecting her to cross-examination by the State").

Moreover, there was little downside to allowing the State to admit the statements Appellant made at the police station before

18

receiving *Miranda* warnings. Appellant's story in that portion of the interview was consistent with the account he gave to police officers at the scene, as he continued to maintain that Andrews was helping him clean the gun and that it fired when Andrews took the gun from him and "cock[ed] it." And while Appellant's statements in that portion of the police-station interview revealed some inconsistencies in his story, the inconsistencies were minor compared to those present in the admissible statements Appellant made to investigators after waiving his *Miranda* rights.[5] As described above, after waiving his *Miranda* rights, Appellant gave several different accounts of how the gun fired that conflicted with one another in significant respects. See *Harris v. State*, 310 Ga. 372, 387-388 (4) (c) (850 SE2d 77) (2020) (holding that trial counsel made a reasonable strategic decision not to seek suppression of the appellant's police

---

[5] Appellant asserts on appeal that "the course of this interview was *ripe* for challenge as an improper 'two-step' (i.e., question first, advise later) interrogation." (Emphasis supplied.) But he did not argue below and makes no argument here that a "two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning," *State v. Abbott*, 303 Ga. 297, 301, 304 (3) (812 SE2d 225) (2018) (citation and punctuation omitted), so we express no opinion on that matter.

interview because the interview "tended to support [the appellant's] overall theory of the case" and "the downside of forgoing an attempt to suppress the . . . interview was limited, considering that much of this evidence was cumulative of other evidence admitted at trial"); *Jones v. State*, 300 Ga. 543, 546-547 (2) (b) (796 SE2d 659) (2017) (no deficient performance where, among other things, damaging evidence from the recordings was cumulative of other evidence, and allowing the statements to be played allowed counsel to present a defense without having the appellant testify).

Appellant highlights trial counsel's testimony at the motion-for-new-trial hearing that he did not believe Appellant was in custody for the initial portion of the interview at the police station and therefore did not believe a motion to suppress would succeed. Appellant contends that he was in fact in custody and that the law did not support trial counsel's assessment of how likely a motion to suppress was to succeed. And for that reason, Appellant argues that trial counsel's strategy in choosing not to file a motion to suppress was objectively unreasonable.

But even assuming that trial counsel's conclusion that Appellant was not in custody was based on a misunderstanding of the law, we have made clear that "decisions of counsel made based on a misunderstanding of the law are not automatically deficient." *Swanson v. State*, 306 Ga. 153, 158 (2) (a) (829 SE2d 312) (2019). See also *Floyd v. State*, 318 Ga. 312, 320-321 (2) (a) (898 SE2d 431) (2024) (noting that "counsel's decisions based on a misunderstanding of the applicable law are not per se deficient"). This is because "it is the *conduct* of the lawyer, not his *thinking*, that we assess for reasonableness." *Powell v. State*, 291 Ga. 743, 748 (2) (b) n.2 (733 SE2d 294) (2012) (emphasis in original). Accordingly, to show that trial counsel's misunderstanding of the law resulted in deficient performance, a defendant must show that, "under the circumstances, the challenged action [itself] cannot be considered a sound trial strategy." *Floyd*, 318 Ga. at 320-321 (2) (a) (citation and punctuation omitted). And here, Appellant has not made that showing. As discussed above, forgoing a motion to suppress was a reasonable strategy, as allowing the State to admit the portion of

21

Appellant's police-station interview before he received *Miranda* warnings had few drawbacks and helped defense counsel present an accident defense without having Appellant testify. Accordingly, this claim fails.

4. Finally, Appellant raises several enumerations of trial court error and ineffective assistance of counsel related to the trial court's jury instructions on unlawful act involuntary manslaughter. See OCGA § 16-5-3 (a) ("A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony."). The record shows that defense counsel requested an involuntary-manslaughter charge to give the jury an option for a "compromise verdict" in the event that the jury did not believe Appellant's main defense of accident. And defense counsel requested charges on reckless conduct and pointing a pistol to serve as misdemeanor predicates for unlawful act involuntary manslaughter.

Although the statute defining the offense of pointing a pistol

provides that "[a] person is guilty of a misdemeanor when he *intentionally* and without legal justification points or aims a gun or pistol at another," OCGA § 16-11-102 (emphasis supplied), Appellant's written request to charge omitted the intent element, stating, "I charge you that it is a misdemeanor offense in the State of Georgia to point or aim a gun or pistol at another person without legal justification." Appellant also filed a written request to charge the jury that "[c]riminal negligence is an element of the offense of [i]nvoluntary [m]anslaughter and must be found by you, the jury, before you may find the Defendant guilty of involuntary manslaughter in this case." The trial court charged the jury in accordance with these requests, and trial counsel did not object to the jury instructions as given.

On appeal, Appellant identifies two errors in the requested instructions, both of which went to the mental-state element of involuntary manslaughter. First, Appellant contends that the trial court plainly erred in giving the pointing-a-pistol charge because the court omitted the offense's statutory intent element. Second, he

contends that the trial court plainly erred in instructing the jury that criminal negligence is an element of unlawful act involuntary manslaughter because, although "the mens rea required for unlawful manner involuntary manslaughter [under OCGA § 16-5-3 (b)[6]] is 'criminal negligence,'" *McIver v. State*, 314 Ga. 109, 122-123 (2) (c) (875 SE2d 810) (2022), the mens rea element for unlawful act involuntary manslaughter under OCGA § 16-5-3 (a) is supplied by the misdemeanor predicate offense. And Appellant argues that these instructions were plainly erroneous when considered as a whole because, together, they charged the jury that the mens rea element for pointing a pistol was criminal negligence, rather than intent. For the same reasons, he contends that trial counsel was ineffective for inviting the trial court to give these instructions or for failing to object to the instructions as given.

Establishing plain error requires an appellant "to show, among

---

[6] OCGA § 16-5-3 (b) provides, "A person commits the offense of involuntary manslaughter in the commission of a lawful act in an unlawful manner when he causes the death of another human being without any intention to do so, by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm."

24

other things, that the alleged error likely affected the outcome of his trial." *Carter v. State*, 317 Ga. 689, 691 (1) (895 SE2d 295) (2023). And establishing ineffective assistance of counsel requires an appellant "to show not only that the failure of his trial counsel to object was professionally deficient, but also that[,] but for such deficient performance, there is a reasonable probability that the result of the trial would have been different." Id. (citation and punctuation omitted). "This Court has equated the prejudice step of the plain error standard with the prejudice prong for an ineffective assistance of counsel claim." Id. (citation and punctuation omitted).

Here, we need not decide whether Appellant affirmatively waived his challenges to the jury instructions, whether the jury charge was clearly erroneous, or whether trial counsel performed deficiently with respect to the jury charge because Appellant has not established prejudice under either the plain error standard or *Strickland*. Appellant contends that the jury charge was prejudicial because it prevented the jury from considering involuntary manslaughter as an alternative to murder if it found that Appellant

intentionally pointed the pistol at Andrews. But the jury instructions did not prevent the jury from finding that Appellant acted in a criminally negligent manner by intentionally pointing the pistol at Andrews. The jury charge did not state or otherwise suggest that intent and criminal negligence were mutually exclusive elements, and the court's general instruction on intent — that "[i]ntent is an essential element of any crime and must be proved by the State beyond a reasonable doubt" — suggested otherwise. Moreover, as we have previously said, it "is neither logically nor legally sustainable" to conclude "that proof of a greater mens rea cannot be used as proof to establish a lesser mens rea." *State v. Springer*, 297 Ga. 376, 381 (1) (774 SE2d 106) (2015) (noting that, as a general matter, "the greater proof of a defendant's intent does not negate or contradict [proof of a lesser kind of culpability] but only subsumes it" (citation and punctuation omitted)). Cf. *Booth v. State*, 311 Ga. 374, 376 (1) (858 SE2d 39) (2021) ("[W]e have . . . rejected the proposition that a finding of an intentional infliction of injury precludes the element of criminal negligence in reckless

conduct and, therefore, have concluded that convictions for both an offense requiring criminal intent and an offense requiring a lesser mens rea, based on the same act against the same victim, are not mutually exclusive."). In other words, contrary to Appellant's contention, the jury could have found him guilty of involuntary manslaughter if it found that he intentionally pointed the gun at Andrews — even under the allegedly erroneous jury charge.

And the alleged instructional errors arguably helped Appellant by widening the range of conduct that could have led to a verdict of involuntary manslaughter. As Appellant acknowledges on appeal, the trial court's jury charge "lower[ed] the mens rea requirement substantially for [the] misdemeanor theor[y] of unlawful act manslaughter" predicated on pointing a pistol. And as a result, the jury charge made it easier, not harder, for Appellant to show that he committed involuntary manslaughter as an alternative to malice murder.

Because the jury rejected Appellant's involuntary-manslaughter theory notwithstanding a jury charge that was more

27

favorable to that theory than the one he now contends should have been given, and because substantial evidence, as described in Division 2, supported the jury's finding that Appellant committed malice murder, Appellant has not established prejudice from the alleged trial court errors and deficient performance. See *Haufler v. State*, 315 Ga. 712, 718 (1) (884 SE2d 310) (2023) ("[T]he evidence of [the appellant's] guilt for the crimes of which he was convicted was substantial, and it is therefore highly probable that the failure to charge on involuntary manslaughter did not contribute to the jury's verdict."); *Carter*, 317 Ga. at 691-692 (1) (holding that the appellant's "claims of plain error and ineffective assistance of counsel predicated on the omission of an accomplice-corroboration jury charge both fail[ed]" because there was "substantial evidence corroborating [the appellant's] involvement in the crimes").[7]

---

[7] Although Appellant similarly argues that the criminal-negligence charge lowered the mens rea element for reckless conduct, which was the other misdemeanor predicate for unlawful act involuntary manslaughter at issue in the case, he does not claim that he suffered prejudice from the alleged instructional error or from trial counsel's alleged deficiency in failing to object to the charge.

Appellant further claims that he suffered cumulative prejudice from these alleged instructional errors and trial counsel's failure to object to the alleged instructional errors. Appellant's cumulative-error claim fails, however, "[b]ecause the harm from th[e] assumed error[s] and assumed deficiency is the same" — namely, that the jury was given allegedly erroneous instructions — "and we have concluded that the [allegedly erroneous] instructions did not likely affect the outcome of the trial." *Priester v. State*, 317 Ga. 477, 492 (5) (f) n.20 (893 SE2d 751) (2023).

*Judgment affirmed. All the Justices concur.*

Decided May 29, 2024 — Reconsideration denied July 2, 2024.

Murder. Hall Superior Court. Before Judge Bearden.

*Lawrence J. Zimmerman, Matthew K. Winchester*, for appellant.

*Lee Darragh, District Attorney, Anna V. Fowler, Kelley M. Robertson, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, M. Catherine Norman, Eric C. Peters, Assistant Attorneys General*, for appellee.